Flora SANTANA, et al., Plaintiffs, Appellants,

v.

Jenaro Collazo COLLAZO, et al., Defendants, Appellees.

Flora SANTANA, et al., Plaintiffs, Appellees,

and

United States of America, Plaintiff-Intervenor, Appellant,

v.

Jenaro COLLAZO, et al., Defendants, Appellees.

Nos. 82–1345, 82–1418.

United States Court of Appeals, First Circuit.

Argued June 8, 1983.

Decided Aug. 3, 1983.

Rehearing and Rehearing En Banc Denied Sept. 30, 1983.

Harry F. Swanger, St. Louis, Mo., and John R. Bird, Frankfort, Ill., with whom Maria Laura Colon, Hato Rey, P.R., was on brief, for Flora Santana, et al.

Charles J. Cooper, Deputy Asst. Atty. Gen., Washington, D.C., with whom Wm. Bradford Reynolds, Asst. Atty. Gen., J. Harvie Wilkinson III, Deputy Asst. Atty. Gen., Brian K. Landsberg, Walter W. Barnett, and Miriam R. Eisenstein, Attys., Dept. of Justice, Washington, D.C., were on brief, for the United States of America.

Before McGOWAN,* Senior Circuit Judge, COFFIN and BREYER, Circuit Judges.

---

* Of the District of Columbia Circuit, sitting by designation.

1. The district court found conditions reviewable under the Eighth Amendment and the due process clause of the Fourteenth Amendment. We note that the Supreme Court has not yet determined whether the requirements of due process apply to Puerto Rico through the Fifth

COFFIN, Circuit Judge.

In October, 1975, eight juvenile residents of the Mayaguez Industrial School (Mayaguez), in Mayaguez, Puerto Rico, filed a complaint, under 42 U.S.C. § 1983, urging the court to declare conditions at Mayaguez unconstitutional. Since that time, two similar suits have been consolidated with the first, and the actions have been certified as a class action on behalf of all present and future juveniles committed to Mayaguez or the Maricao Juvenile Camp (Maricao), in Maricao, Puerto Rico. In addition, on December 6, 1976, the court accepted a Complaint in Intervention of the United States, reinforcing the claims of the main plaintiffs.

After extensive discovery, the district court, on March 27, 1978, ordered the parties to attempt to settle the case. Between August 11, 1978 and June, 1979, the parties submitted three proposed consent decrees, all of which the district court rejected as "unduly and unnecessarily disruptive of the Commonwealth's juvenile justice system." Desiring to see and hear for itself whether conditions at the camps warranted the remedy agreed upon by the parties, the court held extensive hearings, in December and January of 1979–1980 and April to July of 1981. The court also personally inspected conditions at the two camps.

On February 15, 1982, the court rendered its decision, reported at 533 F.Supp. 966 (D.P.R.1982). It analyzed the legal theories on which plaintiffs relied and set out detailed factual findings regarding conditions at the camps. The court rejected plaintiffs' proposed "right to treatment", but agreed that conditions at the camp were reviewable under the Eighth Amendment and the due process clause.[1] With five exceptions, relating primarily to use of the intensive care or "isolation" unit at Mayaguez, *see*

or the Fourteenth Amendment, *see Torres v. Puerto Rico*, 442 U.S. 465, 469, 99 S.Ct. 2425, 2428, 61 L.Ed.2d 1 (1979), but that in this case it makes no difference which Amendment applies. We also assume that the Eighth Amendment applies to Puerto Rico, either directly or through the Fourteenth Amendment.

533 F.Supp. at 992, the court found conditions at Mayaguez and Maricao constitutionally acceptable.

On appeal, plaintiffs challenge the court's refusal to enter the proposed consent decrees. They also renew their claim for a "right to treatment", and, on that basis, challenge a number of conditions and deprivations which the court found constitutionally acceptable. Finally, they urge that certain conditions, particularly those relating to the use of the isolation unit as a disciplinary sanction, which use the district court did not enjoin or limit, violate their right not to be cruelly and unusually punished. Plaintiff-intervenor, on appeal, challenges only the district court's failure to find certain fire hazards at Mayaguez unconstitutional and to order that they be remedied.

## I. Consent Decrees

We sympathize with plaintiffs' frustration in having been ordered to negotiate a settlement and then having had three proposed consent decrees rejected by the court. We also acknowledge our role in rendering the district court's refusals essentially unreviewable. Plaintiffs appealed to us from those decisions and we dismissed for lack of an appealable order. Since then, the Supreme Court has made clear the error of our ways. In *Carson v. American Brands, Inc.,* 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981), the Court held that a district court's refusal to enter a proposed consent decree is immediately appealable under 28 U.S.C. § 1292(a)(1). Plaintiffs did not, however, seek relief from the Supreme Court for our refusal to hear their interlocutory appeal. And, somewhat ironically, the reasons given by the Court in *Carson* for holding the district court's refusal immediately appealable are the same reasons why it appears to us now too late to review the merits of the proposed consent decrees.

In *Carson,* the Supreme Court reasoned that:

"unless the District Court order denying the motion to enter the consent decree is immediately appealable, petitioners will lose their opportunity to 'effectually challenge' an interlocutory order that denies them injunctive relief and that plainly has 'serious, perhaps irreparable, consequence.' First, petitioners might lose their opportunity to settle their case on the negotiated terms .... Settlement agreements may ... be predicated on an express or implied condition that the parties would, by their agreement, be able to avoid the costs and uncertainties of litigation. .... Because a party to a pending settlement might be legally justified in withdrawing its consent to the agreement once trial is held and final judgment entered, the District Court's order might thus have the 'serious, perhaps irreparable, consequence' of denying the parties their right to compromise their dispute on mutually agreeable terms." 450 U.S. at 86–88, 101 S.Ct. at 997–98 (citations omitted).

In this case, defendants have withdrawn their consent to the proposed settlement. Moreover, having the evidence presented at the trial before us, and the benefit of the district court's assessment of that evidence, it would be difficult for us now to "judge the fairness of [the] proposed compromise by weighing the plaintiff[s'] likelihood of success on the merits against the amount and form of the relief offered in the settlement." *See Carson,* 450 U.S. at 88 n. 14, 101 S.Ct. at 998 n. 14. Finally, while public policy favors the enforcement of an amicable settlement of litigation without trial, *see Cities Service Oil Co. v. Coleman Oil Co.,* 470 F.2d 925, 929 (1st Cir.1972), it is now too late to avoid the time and expense of trial. Rather than seeking to return to the situation as it existed before the parties and the court invested a year and a half in a trial, we think it wiser to turn to the merits of the issues presented to and reviewed by the district court and which form the basis of its detailed findings regarding conditions at Mayaguez and Maricao.

## II. Conditions of Confinement at Mayaguez and Maricao

On appeal, plaintiffs renew both their "right to treatment" claims and their

Eighth Amendment challenge to the length of time a juvenile may be confined in isolation at Mayaguez and to the conditions under which the juveniles live while so isolated. We agree with the district court that the state has no constitutional obligation to provide rehabilitative treatment to the juveniles within its custody, simply because its professed purpose in taking custody of the juveniles is to help them. We are concerned, however, that the district court, in rejecting the right to treatment, may have passed too lightly over other substantive limitations on the conditions of involuntary confinement, particularly the extensive use of isolation at Mayaguez. Before addressing those concerns, we pause to explain why we agree with the district court's rejection of a broad right to rehabilitative treatment and training.

### A. Right to Rehabilitative Treatment and Training

Plaintiffs challenge, as violative of their right to rehabilitative treatment, the inadequate intake assessment of each juvenile's psychiatric, medical, academic, vocational and social strengths, weaknesses and needs, coupled with the inadequate classification system (based on age and physical characteristics); the absence of adequate individualized treatment plans covering all aspects of each juvenile's care, education, growth and development; the absence of adequate educational, vocational and recreational programs; the deficient qualifications and training of the staff; and overreliance on the custodial staff. Basically, they claim that the juveniles are just being incarcerated, not rehabilitated, and that in light of the state's professed purpose in institutionalizing the juveniles—to treat them—the state has an obligation to provide the promised treatment.

A number of courts have found that juveniles involuntarily incarcerated have a right to rehabilitative treatment. *See, e.g., Morgan v. Sproat,* 432 F.Supp. 1130 (S.D.Miss. 1977); *Martarella v. Kelley,* 349 F.Supp. 575, 586, 600 (S.D.N.Y.1972); *Nelson v.*

*Heyne,* 355 F.Supp. 451 (N.D.Ind.1972) *aff'd,* 491 F.2d 352 (7th Cir.1974). The reasoning of these courts is two-fold. First, relying on the Supreme Court's insistence, in *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972), that "the nature and duration of commitment must bear some reasonable relation to the purpose for which the individual is committed", courts have reasoned that because the state's authority over delinquent juveniles derives from its parens patriae interest in their welfare, *see, e.g.,* 34 L.P.R.A. § 2015, due process requires that juveniles confined under that authority be given treatment consistent with the beneficent purpose of their confinement. *See Morgan v. Sproat, supra,* 432 F.Supp. at 1135–36; *Martarella v. Kelley, supra,* 349 F.Supp. at 585. Second, courts have relied on the fact that the juvenile justice system denies certain due process safeguards, which denials have been found constitutionally acceptable because the purpose of incarceration is rehabilitation, not punishment. *See, e.g., McKeiver v. Pennsylvania,* 403 U.S. 528, 547, 91 S.Ct. 1976, 1987, 29 L.Ed.2d 647 (1971) (no right to jury trial in juvenile proceedings). Thus, the "quid pro quo" for the denied safeguards is the promised rehabilitation. *See Morgan v. Sproat, supra,* 432 F.Supp. at 1136 and cases discussed therein.

As the district court in this case recognized, both of the theoretical bases for the claimed right to rehabilitative treatment are questionable. Although states have asserted their parens patriae authority in exercising control over problem juveniles, they may legitimately confine individuals solely to protect society from them. *See O'Connor v. Donaldson,* 422 U.S. 563, 583, 95 S.Ct. 2486, 2497, 45 L.Ed.2d 396 (1975) (Burger, C.J., concurring); *McKeiver v. Pennsylvania, supra,* 403 U.S. at 546 n. 6, 91 S.Ct. at 1986 n. 6. In addition, even without treatment, simply removing a juvenile from a dangerous or unhealthy environment may be a legitimate exercise of the

state's parens patriae authority.[2] *Cf. O'Connor v. Donaldson, supra,* 422 U.S. at 584, 95 S.Ct. at 2498. *See also Morales v. Turman,* 562 F.2d 993, 998 (5th Cir.1977). In short, since rehabilitative treatment is not the only legitimate purpose of juvenile confinement, the Supreme Court's insistence that the nature of confinement must bear a reasonable relationship to the purpose of that confinement gains plaintiffs little ground in their effort to establish a right to rehabilitative treatment.

The second aspect of the quid pro quo theory has even less merit. The procedural protections accorded juvenile offenders may differ from those accorded criminal defendants, because the demands of due process differ according to the interests of the individual and of society in the given situation. *See Morrisey v. Brewer,* 408 U.S. 471, 480–84, 92 S.Ct. 2593, 2599–01, 33 L.Ed.2d 484 (1972); *Morales v. Turman, supra,* 562 F.2d at 998. The Supreme Court has found certain distinctions between the protections accorded juveniles and those accorded criminal defendants constitutionally acceptable. *See, e.g., McKeiver v. Pennsyl-*

*vania,* 403 U.S. at 550–51, 91 S.Ct. at 1988–89. Were that not the case, no amount of treatment would make up for the denial of due process along the way. *Cf. O'Connor v. Donaldson, supra,* 422 U.S. at 585–88, 95 S.Ct. at 2498–2500 (Burger, C.J., concurring.)

In short, there is no legally cognizable quo to trigger a compensatory quid. We therefore agree with the district court that although rehabilitative training is no doubt desirable and sound as a matter of policy and, perhaps, of state law,[3] plaintiffs have no constitutional right to that rehabilitative training. With that in mind, we turn to plaintiffs' challenge to the practice of confining juveniles to the isolation unit at Mayaguez as punishment for disciplinary infractions.

### B. Due Process and Eighth Amendment Limitations on the Confinement of Juveniles to Isolation

The district court made a number of factual findings regarding the use of isolation

---

**2.** 34 L.P.R.A. § 2002 provides for two or more judges to take cognizance of matters concerning, *inter alia:*

"1. Any child:
(a) Whose parents or other persons legally responsible for his care and support, being able to do so, have wilfully or negligently failed to provide the care, education or protection prescribed by law for his welfare.
(b) Who is deemed undisciplined, and whose parents, tutors or teachers are unable to control him, thus jeopardizing his own or the community's welfare, provided that the Secretary of Social Services certifies that the case has been referred to him and, after providing services in the community to him, his conduct is still deemed as undisciplined.
(c) Who violates or has attempted to violate any Commonwealth law or municipal ordinance.
2. The custody of any child.
3. A petition to place a child in a suitable institution for his treatment."
34 L.P.R.A. § 2010 authorizes a judge, upon a finding that the condition or behavior of a child brings him under the provisions of section 2002, to, *inter alia,* enter an order:
"4. Placing the child under the custody of the Secretary of Health for commitment to an institution suitable for the treatment of

children, or for his placement in a foster home . . . ."
Plaintiffs have not challenged the legitimacy of the state's interest in incarcerating them. Nor have they alleged that there are juveniles at either Mayaguez or Maricao who have committed no offense and whose release would present no danger either to themselves or to the community. Thus, as we interpret the record before us, we are not presented with the issue of what treatment obligations the due process clause imposes on the state when it incarcerates juveniles solely for the purpose of treatment, or of the constitutional legitimacy of such incarceration. *Cf. O'Connor v. Donaldson,* 422 U.S. at 573, 95 S.Ct. at 2492; *id.* at 585, 95 S.Ct. at 2498 (Burger, C.J., concurring).

**3.** In their Proposed Conclusions of Law, presented to the district court after the hearing, plaintiffs urged the court to find that they had a state law right to treatment. The district court found that "the right to treatment is unquestionably a cognizable right pursuant to the Constitution and laws of the Commonwealth", 533 F.Supp. at 971–72, but, because neither plaintiffs nor plaintiff-intervenor had relied on Puerto Rico law in its complaint, the court declined to address the state law issue. Plaintiffs do not renew before us their argument for a state law right to treatment.

at Mayaguez.[4] *See* 533 F.Supp. at 983, 989–90. The court noted, for instance, that:

"34. The intensive care unit complex at Mayaguez, which is also referred to as the 'isolation' or 'disciplinary' unit, is a separate concrete building located approximately fifty yards from the quadrangle where the regular dormitories are located. It is also quadrangular in shape, and is surrounded by a ten foot high chain link fence, topped with barbed wire. The building is made of reinforced concrete, with an interior courtyard. The cells face inward and are approximately nine feet by nine feet square in size. They contain one bed, a toilet facility and a window facing the outside of the building. The window and the door are barred. The ceiling is ten to twelve feet high. The cells themselves are clean but bare, except for a wood slab with a foam mattress covered by a sheet, and a wash basin and toilet. Cross ventilation offers adequate ventilation. Neither the door nor windows are screened.

"74. It is a regular practice in Mayaguez to separate juveniles individually from the rest of the inmate population for disciplinary reasons. Juveniles so sanctioned are placed in the individual cells previously indicated as being located in the so called intensive treatment or isolation unit.

"76. The average length of stay in the isolation cells from September 18, 1979 to December 18, 1979 which is a representative period, was 13.3 days. There are, however, several known cases of juveniles having spent several months at one stretch in isolation.

"77. The sole activity of juveniles while in isolation is eating and sleeping. They do not attend the Mayaguez academic or vocational school program and are not allowed any writing or reading material in their cells except the Bible. Furthermore, they are not allowed any physical exercise or recreation; the only time they are allowed out of the isolation cell is for a daily shower."

The court then enjoined certain uses of the isolation unit as unconstitutional. It forbade commitment of a juvenile to isolation because of "any illness, sickness, or physical or mental defect or disease"; commitment to isolation of any pre-trial juvenile detainee; and commitment to isolation of any juvenile without notice of the charges against him and an opportunity to contest them. It also instructed defendants to write and post disciplinary rules specifying proscribed conduct and resulting sanctions. *Id.* at 992. The court did not, however, address additional claims by plaintiffs and plaintiff-intervenor that the conditions of confinement in isolation at Mayaguez, even for juveniles determined after an appropriate hearing to be guilty of disciplinary infractions, are unconstitutional.

A number of courts have found conditions of isolation similar to those at Mayaguez unconstitutional when imposed on juvenile offenders. *See, e.g., Feliciano v. Barcelo,* 497 F.Supp. 14 (D.P.R.1979); *Morgan v. Sproat, supra,* 432 F.Supp. at 1138–40; *Pena v. New York State Division for Youth,* 419 F.Supp. 203, 210–11 (S.D.N.Y.1976); *Nelson v. Heyne, supra,* 355 F.Supp. at 456–57; *Inmates of Boys' Training School v. Affleck,* 346 F.Supp. 1354 (D.R.I.1972); *Lollis v. New York State Dept. of Social Services,* 322 F.Supp. 473, 482 (S.D.N.Y.1970), *remedy modified on rehearing,* 328 F.Supp. 1115 (S.D.N.Y.1971). The reasoning of those courts, however, has been closely tied to their determination that conditions of juvenile detention must be rehabilitative. *See, e.g., Morgan v. Sproat, supra,* 432 F.Supp. at 1139–40; *Pena v. New York State Division for Youth, supra,* 419 F.Supp. at 207; *Nelson v. Heyne, supra,* 355 F.Supp. at 456; *Inmates of Boys' Training School v. Affleck, supra,* 346 F.Supp. at 1366–67. *But see Morales v. Turman, supra,* 562 F.2d at 998 n. 1 (prolonged isolation of juveniles in *Pena v. New York State Division for Youth* could have been prohibited under cruel and unusual standards); *Lollis v. New York State Dept. of Social Services, supra,* 322 F.Supp. at 482–83 (two-week confine-

---

4. There is no isolation unit at Maricao.

ment of a fourteen year old girl in a stripped room in night clothes with no recreational facilities or reading matter was cruel and unusual).

In the context of adult prisons, the Supreme Court has made clear that not every aspect of prison discipline must serve a rehabilitative purpose. *See Hutto v. Finney,* 437 U.S. 678, 686 n. 8, 98 S.Ct. 2565, 2571 n. 8, 57 L.Ed.2d 522. It has also indicated that the Eighth Amendment prevents only conditions of confinement that involve the wanton and unnecessary infliction of pain, that deny basic human needs or that are grossly disproportionate to the severity of the crime warranting imprisonment. *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Thus, courts that have examined the confinement of adults in prison isolation cells have been reluctant to find them unconstitutional, based either on the length of confinement or on the possibility that isolation might cause psychiatric deterioration. *See Jackson v. Meachum,* 699 F.2d 578, 581–83 (1st Cir.1983); *Gibson v. Lynch,* 652 F.2d 348 (3d Cir.1981); *Newman v. Alabama,* 559 F.2d 283 (5th Cir.1977); *Sostre v. McGinnis,* 442 F.2d 178 (2d Cir.1971). *See also Hutto v. Finney,* 437 U.S. 678, 687, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978) (length of time in isolation was one consideration among many rendering the conditions in isolation cells unconstitutional).

■ The Supreme Court has not addressed the use of isolation in a juvenile detention center. While we are unwilling to say that isolation of juveniles is necessarily unconstitutional, we are satisfied that the considerations relevant to an assessment of isolation in a juvenile camp are somewhat different from those relevant to an assessment of the same treatment in a prison. In the first place, as the Supreme Court has noted, there is no simple test for determining whether conditions of confinement are cruel and unusual. The Eighth Amendment draws its meaning from "evolving standards of decency that mark the progress of a maturing society". *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598,

2 L.Ed.2d 630 (1958). It would not be unreasonable to assume that society's conscience might be shocked by the conditions of confinement imposed on a juvenile in an isolation cell, when it would be unwilling to label the same treatment, given to an adult, cruel and unusual. *See, e.g., Lollis v. New York State Department of Social Services, supra,* 328 F.Supp. at 1118.

■ Even more important than Eighth Amendment concerns for our purposes, juveniles like plaintiffs, who have not been convicted of crimes, have a due process interest in freedom from unnecessary bodily restraint which entitles them to closer scrutiny of their conditions of confinement than that accorded convicted criminals. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (U.S.1982), for instance, the Supreme Court required that restrictions on the liberty of an involuntarily confined mental patient be reasonably related to legitimate government interests in imposing those restrictions. Although it noted that even convicted criminals retain a liberty interest in freedom from bodily restraint, the Court indicated that the interest is entitled to more careful protection when the individual asserting it has not been convicted of a crime. *See* 457 U.S. at 320, 102 S.Ct. at 2460.

■ The district court had before it only the Third Circuit's opinion in *Youngberg.* It noted that the Supreme Court had granted certiorari in *Youngberg,* but found *Youngberg* "clearly distinguishable" from the case before it. 533 F.Supp. at 976–77 n. 10. In light of the Supreme Court's reasoning in *Youngberg,* we must disagree. While there are important distinctions between the involuntary confinement of a mentally retarded person and that of a problem juvenile, the crucial similarity is that in neither context may the state assert punishment as a legitimate interest warranting incarceration. The state acquires the right to punish an individual only after it has tried and convicted him as a criminal. *See Jones v. United States,* —— U.S. ——, ——, 103 S.Ct. 3043, 3045, 77 L.Ed.2d 694 (1983) (evaluating the rights of a crimi-

nal defendant found not guilty by reason of insanity: "As he was not convicted, he may not be punished."); *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979); *Ingraham v. Wright,* 430 U.S. 651, 671–72 n. 40, 97 S.Ct. 1401, 1412–13 n. 40, 51 L.Ed.2d 711 (1977)). The juveniles over whom Puerto Rico exercises its authority pursuant to the Minors Law have not been convicted of crimes. Some have committed no offense at all, but are simply "deemed undisciplined". *See* 34 L.P. R.A. § 2002.1(b); note 2, *supra.* *Cf. Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962) (Eighth Amendment prohibits criminal punishment for the "status" of narcotic addiction). Even regarding those juveniles who have committed offenses, the statute makes clear that the proceedings are not to be deemed to be of a criminal nature, nor is a child [5] to be considered a criminal or a convict. *See* 34 L.P.R.A. § 2011. This does not mean that the Commonwealth is powerless to punish. But if it seeks to do so, it must choose the criminal, not the juvenile, course. *See* 34 L.P.R.A. § 2004.

▆ The Supreme Court has recognized that the deprivation of liberty and conditions of confinement of both juvenile detention and involuntary confinement of the mentally ill may be sufficiently analogous to criminal punishment to warrant the protection of the Eighth Amendment. *See Ingraham v. Wright,* 430 U.S. at 669 n. 37, 97 S.Ct. at 1411 n. 37. The possibility of Eighth Amendment protection, however, does not mean that the state may assert punishment as a legitimate goal of incarceration. Thus, because the state has no legitimate interest in punishment, the conditions of juvenile confinement, like those of confinement of the mentally ill, are subject to more exacting scrutiny than conditions imposed on convicted criminals. *See Youngberg,* 457 U.S. at 321, 102 S.Ct. at 2461 ("[p]ersons who have been involuntarily committed are entitled to more considerate

treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."); *id.* at 320 n. 27, 324, 102 S.Ct. at 2460 n. 27, 2463 (recognizing that, under *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), conditions of confinement must comport with the non-punitive purpose of that confinement).

▆ The distinction between conditions imposed for the legitimate purpose of maintaining institutional order and safety and those that amount to retribution is a fine one. *See Bell v. Wolfish,* 441 U.S. at 535–40, 99 S.Ct. at 1872–74. Certainly, administrators of a juvenile home must be free to discipline the home's residents. And, in doing so, the state of course inflicts punishment for offending behavior. The distinction, however, is not an entirely meaningless one. *Cf. Ingraham v. Wright,* 430 U.S. at 671 & n. 40, 97 S.Ct. at 1412 & n. 40 (distinguishing between disciplinary punishment, which requires no Eighth Amendment scrutiny, and retributive punishment, which requires criminal conviction). In a case such as this, it may simply be a matter of the closeness with which courts should be willing to scrutinize the state's asserted interest in imposing burdensome conditions of confinement. When the conditions are imposed on convicted criminals, the Supreme Court has deferred to the judgment of prison administrators unless the conditions are cruel and unusual, because "[t]o the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman,* 452 U.S. at 347, 101 S.Ct. at 2399. For an individual not convicted of a crime, however, restrictions on his liberty beyond his initial incarceration must be reasonably related to some legitimate government objective—of rehabilitation, safety or internal order and security. *See Youngberg,* 457 U.S. at 320, 102 S.Ct. at 2460; *Bell v. Wolf-*

---

**5.** A "child" is "a person under 18 years of age or a person who having reached 18 years of age is held to answer for an actual or attempted violation of a commonwealth law or a munici-pal ordinance committed by said person before his having attained the age of 18 years". 34 L.P.R.A. § 2001(c).

*ish,* 441 U.S. at 539, 99 S.Ct. at 1874. *See also Milonas v. Williams,* 691 F.2d 931, 942 n. 10 (10th Cir.1982) (applying *Youngberg* to conditions at home for adolescents with behavioral problems and requiring that conditions not amount to punishment); *Scott v. Plante,* 641 F.2d 117, 130 n. 11 (3d Cir.1981) (conditions of confinement of persons incompetent to stand trial may not amount to punishment), *on remand in light of Youngberg, substantially reinstated,* 691 F.2d 634, 639 (3d Cir.1982).

█ The district court did not have the benefit of the Supreme Court's guidance in *Youngberg* and made no findings regarding the legitimacy and weight of the state's interest in confining the juveniles in isolation. Were there nothing of concern in the record, we might be inclined to assume that the state's interest, presumably in protecting the juveniles from harm, in discouraging offending behavior and in preventing escapes, was sufficient to justify the deprivations imposed. A number of experts testified, however, that isolation for longer than a few hours serves no legitimate therapeutic or disciplinary purpose and is unnecessary to prevent harm unless a juvenile is severely emotionally disturbed. In addition, the experts testified, extended isolation can be psychologically damaging and, under the conditions of Mayaguez, may be physically harmful.[6] The district court recognized that "[i]solation as a disciplinary measure, under the circumstances present in this case, entails a substantial curtailment of a juvenile's freedom." 533 F.Supp. at 990. We agree and are satisfied that the curtailment is substantial enough to warrant further examination of the necessity for and conditions of this confinement.

█ The Supreme Court has cautioned us against substituting our judgment for that of correction officials charged with maintaining institutional order and security. *Bell v. Wolfish,* 441 U.S. at 547–48, 99 S.Ct. at 1878–79. It may be that certain juveniles at Mayaguez are so difficult to control that extended isolation is a reasonable way to maintain order, prevent injury and deter escapes. In that case, regardless of the wisdom of such a practice as a matter of policy and of the fact that the juveniles may suffer from the practice, we would be unwilling to say, on the record before us, that the practice was unconstitutional. On the other hand, when a juvenile is confined in isolation for an extended period of time—sometimes months—with little attention from camp administrators or counselors, no exercise and no contact with other juveniles, it seems likely that the experience accomplishes nothing more than the unnecessary infliction of pain. Whatever the constitutional legitimacy of such practices in a prison, we consider ourselves charged by the Supreme Court's due process analysis in *Youngberg* and *Bell v. Wolfish* to ask whether this significant restriction of the juveniles' liberty interests is reasonably related to a legitimate government objective, or simply adds to the punishment already imposed by incarceration.

The district court made no findings regarding the therapeutic or damaging effects of extended isolation. It ordered defendants to post disciplinary rules specifying proscribed conduct and sanctions to be imposed for violations thereof, but set no limits on the length of time a juvenile may be put in isolation, the offenses that would warrant it, or the conditions a juvenile may be subjected to while in isolation. Rather than substitute our judgment for that of the district court, we think a remand is necessary for the court to consider, based on the testimony already presented to it and its own examination of conditions at Mayaguez, whether and to what extent isolation as employed there is reasonably related to any legitimate government objectives. In doing so, the court should consider whether isolation should be limited to certain time periods and should require additional safeguards, such as close supervision by a qualified expert and periodic review of the continuing need for isolation. Finally, the court should consider whether minimal ad-

---

**6.** Juveniles held in the isolation unit at Mayaguez apparently have suffered dehydration, numerous insect bites, severe depression and signs of sensory deprivation.

ditional individual attention might reduce the need for isolation. For instance, the district court found that there are four basic groups of juveniles at Mayaguez: "mentally retarded juveniles, psychiatrically ill juveniles, those with minor psychological problems and serious social difficulties, and serious offenders. The first three groups comprise the majority of the population .... The group with mental retardation clearly represents a major proportion of the Mayaguez population and this group covers the range from severe to mild retardation." 533 F.Supp. at 980.

Several witnesses testified that a major source of the camp's inability to address its disciplinary and escape problems without extensive use of isolation [7] is the fact that it makes little effort to separate juveniles according to their particular problems, but only according to size and age. Thus, while one juvenile may be incorrigible, a number of others are simply retarded and could benefit from training in how to conform their behavior to acceptable patterns. Instead, they learn from their incorrigible peers, with whom they are cast. Similarly, dealing with emotionally disturbed juveniles as a group with common problems might significantly reduce the emotional outbursts currently leading to their confinement in isolation.

In *Youngberg,* relying on the liberty interest of even a convicted criminal in freedom from unnecessary bodily restraint, the Supreme Court required the state to provide minimally adequate or reasonable training to a mental incompetent to protect that interest. Reasonableness, of course, depends on the circumstances of the case and should be assessed in light of the judgment of qualified professionals. *See* 457 U.S. at 319 & n. 25, 102 S.Ct. at 2460 & n. 25. Nevertheless, in this case, as in *Young-*

*berg,* if the state can avoid the current extensive use of isolation by minimal additional attention—to distinguishing between and attempting to address the sources rather than the effects of the residents' behavior problems, it may well be unreasonable for the state not to do so. *See* 457 U.S. at 321, 102 S.Ct. at 2461. The district court may be aware of other possibilities that, with minimal additional attention might alleviate the need for extensive use of isolation. For instance, we note the possibilities, under 34 L.P.R.A. § 2007(c), of removing a juvenile over 16 years of age temporarily to a place of detention for adults, provided the juvenile is kept separated from the adults and, under 34 L.P.R.A. § 2004, of prosecuting juveniles over 16 years of age as adults. If behavior problems at Mayaguez are attributable to a limited number of particularly difficult older juveniles, removal of those few might enable the administrators to retain control of the situation and avoid the need for placing a number of juveniles in extended isolation. We profess no expertise in the administration of a camp for juveniles. Nor have we, like the district court, had the benefit of first hand knowledge of the evidence in the case and physical examination of the camps themselves. We are, however, troubled by the possibility that some juveniles at Mayaguez have been and will continue to be subjected to unpleasant and perhaps physically and psychologically damaging restrictions on their liberty that are not reasonably related to legitimate government interests in imposing those restrictions.

## III. Fire Hazards

The United States challenges the district court's failure to address what it considers to be significant fire hazards at Mayaguez. It points to evidence that polyurethane

---

**7.** Evidence produced by the Plaintiff-Intervenor highlights the extent of the use of isolation at Mayaguez. Between 1977 and 1981, the juvenile population at Mayaguez ranged from a low of 67 to a high of 158. 533 F.Supp. at 980. During that same period, the evidence indicates there were often 10 juveniles in isolation at one time. Between June, 1977 and April,

1978, the Log Book of the Intensive Treatment Unit records 497 commitments to the Unit. 171 were for 5 days or more. 31 were for 20 days or more. Between January, 1980 and April, 1981, there were 602 instances of isolation. 39 were for less than a day. 60 were for 20 days or more and 1 was for 197 days.

mattresses are used throughout the institution and that polyurethane is highly inflammable, burns quickly at high temperatures and emits extremely toxic gasses. In fact, two juveniles at Mayaguez died several years before the trial in a fire they set to their mattresses. According to one witness, the two juveniles were in the cell with the fire only about a minute and a half. The United States also points to evidence that the fire extinguishers not only needed charging, but were inadequate, and that there was a need for an evacuation plan in the event of fire. It therefore urges that the court erred in not ordering that polyurethane mattresses be replaced by mattresses made of a fire-resistant material, that fire extinguishers be properly charged and maintained, and that an adequate evacuation plan be formulated.

There is no question that fire safety is a legitimate concern under the Eighth Amendment. *See, e.g., Ruiz v. Estelle,* 679 F.2d 1115, 1152–53 (5th Cir.1982); *Leeds v. Watson,* 630 F.2d 674, 675–76 (9th Cir.1980); *Dimarzo v. Cahill,* 575 F.2d 15, 16, 19 (1st Cir.1978). Persons involuntarily confined by the state have a constitutional right to safe conditions of confinement. *Youngberg v. Romeo,* 457 U.S. at 315, 102 S.Ct. at 2458. The state has a duty to ensure that safety, because the individuals concerned, by reason of the confinement, cannot provide for their own safety. *Cf. Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976). We are also aware, however, that not every deviation from ideally safe conditions constitutes a violation of the constitution, *see Ruiz, supra,* 679 F.2d at 1153; *Bell v. Wolfish,* 441 U.S. at 543 n. 27, 99 S.Ct. at 1876 n. 27, and that the district court has a much better appreciation of conditions at Mayaguez than we can hope to attain, however diligent our perusal of the record.

Although the district court said nothing in its order about fire safety, it did recognize some of the fire hazards of concern to the United States. The court found that:

"A number of fire extinguishers in use throughout Mayaguez were not properly maintained in operational order, it appearing that they were not adequately charged. Once this situation is corrected the Court is not aware of other fire safety hazards at the Mayaguez, other than the polyurethane mattresses." 533 F.Supp. at 984.

It appears that the court assumes that the fire extinguishers will in the future be adequately charged. It did not, however, so order. It is also not clear whether the court assumes that the polyurethane mattresses will be replaced or that, while the mattresses are a fire hazard, the hazard does not rise to constitutional dimensions. Finally, the court made no findings regarding the adequacy of the fire extinguishers, once properly charged, or the need for an evacuation plan.

We agree with the United States that the court has not adequately addressed the evidence presented to it that conditions at Mayaguez are not as safe from the danger of fire as the constitution requires that they be. Having no first hand knowledge of the evidence, we are reluctant to say that the polyurethane mattresses must all be replaced, or that new fire extinguishers must be purchased and an evacuation plan be formulated. We think, however, that the district court should address those concerns and, if it finds current conditions constitutionally inadequate, should order that they be remedied.

*The portion of the district court's judgment, enjoining defendants from continuing certain unconstitutional actions and practices is affirmed. On the remaining issues of the constitutionality of defendants' use of isolation as a disciplinary sanction at Mayaguez and the adequacy of defendants' fire safety measures at Mayaguez, the judgment is vacated and remanded for further proceedings consistent with this opinion. No costs at this time.*