Flora SANTANA, et al.,
Plaintiffs, Appellants,

v.

Jenaro Collazo COLLAZO, et al.,
Defendants, Appellees.

No. 85–1389.

United States Court of Appeals,
First Circuit.

Argued March 4, 1986.

Decided June 11, 1986.

John R. Bird, National Juvenile Law Center, with whom Maria Laura Colon, Puerto Rico Legal Services, Canovanas, P.R., was on brief, for appellants.

Reina Colon De Rodriguez with whom Rafael Ortiz-Carrion, Sol. Gen., and Doris Zoe Pons-Pagan, Asst. Sol. Gen., Hato Rey, P.R., were on brief, for appellees.

Before CAMPBELL, Chief Judge, COFFIN, Circuit Judge, and PETTINE,* Senior District Judge.

COFFIN, Circuit Judge.

This appeal is another phase of a class action challenging the treatment of residents in two juvenile detention facilities in

* Of the District of Rhode Island, sitting by desig-    nation.

Puerto Rico. Our decision in an earlier appeal, *Santana v. Collazo*, 714 F.2d 1172 (1st Cir.1983), resolved some issues but remanded for further development of the record, reflection, and decision the question of whether isolation as imposed on juveniles at the Mayaguez Industrial School satisfies constitutional standards.[1] Because we are not, at this juncture, satisfied that the record has been sufficiently developed to allow the kind of review we contemplated, we are not yet in a position to approve or disapprove of the decision below, which found conditions at Mayaguez to be constitutional. To make clear our sense of inadequacy we rehearse the posture of this issue as we last left it, the scope and depth of the inquiry below, and the nature of our residual uncertainty.[2]

## I.

Plaintiffs-appellants are a certified class of all present and future juveniles committed to the Mayaguez Industrial School in Mayaguez, Puerto Rico, or the Maricao Juvenile Camp in Maricao, Puerto Rico. The United States was added as a party when it filed a complaint in intervention reinforcing the claims of the main plaintiffs that conditions at the two facilities were unconstitutional. Plaintiffs originally sought to establish a constitutional right to treatment on behalf of the juveniles incarcerated at the facilities, and the district court therefore heard considerable testimony about all aspects of life in the institutions over a number of days of trial in late 1979, early 1980 and mid-1981. In its opinion, *Santa-*

na v. Collazo, 533 F.Supp. 966 (D.P.R. 1982), the district court rejected the claimed right to treatment but did enjoin certain uses of the isolation unit at Mayaguez as unconstitutional. For example, it prohibited commitment of a juvenile to isolation because of sickness or mental defect; commitment of a juvenile without notice of the charges against him and an opportunity to contest them; and commitment of any pre-trial juvenile detainee. The district court did not, however, address claims that isolation as practiced at Mayaguez is unconstitutional even when imposed as a disciplinary measure after an appropriate hearing.

On appeal in 1983, plaintiffs renewed their claim to a right to treatment and their challenge to the use of isolation. We affirmed the district court on the right to treatment question, but found it necessary to remand the isolation issue. We began our discussion of isolation by noting the factual findings of the district court regarding the use of isolation at Mayaguez. According to those findings, 533 Supp. at 983, 989–90, "cells" in the isolation unit at Mayaguez measured nine feet by nine feet, and contained only a wood slab with a foam mattress covered by a sheet, a wash basin, and toilet. The average length of stay in the isolation cells was 13.3 days, although at least several juveniles had spent continuous months in isolation.

"The sole activity of juveniles while in isolation is eating and sleeping. They do not attend the Mayaguez academic or vocational school program and are not

---

1. There is no isolation unit at the other facility, the Maricao Juvenile Camp.

2. In our earlier opinion, we agreed with the plaintiff in intervention, the United States, that the district court had not adequately addressed evidence that fire safety conditions at Mayaguez did not meet constitutional standards. We therefore remanded that issue as well for consideration by the district court. In its decision after remand, the district court found that the fire safety conditions either had been, or soon would be, remedied, and that fire safety was therefore a "non-issue".

In their brief on this appeal, appellants asked for an injunction barring defendants from con-

tinued use of polyurethane mattresses and requiring that an adequate number of fire extinguishers be maintained in working order. At oral argument, defendants stated that the polyurethane mattresses have been replaced and that the facility has a sufficient number of working fire extinguishers. We think it unnecessary to issue an injunction at this time because we consider it implicit in the district' court's decision that should either of those conditions change, plaintiffs would be entitled to return to that court for relief. Of course, we urge the district court to be certain that neither problem does, in fact, still exist.

allowed any writing or reading material in their cells except the Bible. Furthermore, they are not allowed any physical exercise or recreation; the only time they are allowed out of the isolation cell is for a daily shower". *Id.* at 989.

We declined to find that isolation in these circumstances was unconstitutional *per se.* We found, however, that these conditions substantially curtailed the freedom of juveniles placed in isolation, and thus deserved close scrutiny. *Santana v. Collazo,* 714 F.2d 1172, 1181 (1st Cir.1983). We noted that while courts have been reluctant to find isolation cells unconstitutional in adult prisons, *id.* at 1179, juveniles who have not been convicted of crimes have "a due process interest in freedom from unnecessary bodily restraint which entitles them to closer scrutiny of their conditions of confinement than that accorded convicted criminals". *Id. See Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (restrictions on liberty of involuntarily confined mentally-retarded patients must be reasonably related to legitimate government interests). Moreover, because the Commonwealth has no legitimate interest in punishing such juveniles as retribution for past misdeeds (as may be permissible in the case of convicted criminals), restrictions on their liberty must be justified on the basis of other objectives—rehabilitation, safety, or internal order and security. 714 F.2d at 1180.

We recognized, however, that administrators of a juvenile home must be allowed to punish residents for the purpose of discipline. And we conceded that "[t]he distinction between conditions imposed for the legitimate purpose of maintaining institutional order and safety and those that amount to retribution is a fine one." *Id.* Yet, in this case, we found that it was a distinction demanding attention.

"Were there nothing of concern in the record, we might be inclined to assume that the state's interest, presumably in protecting the juveniles from harm, in discouraging offending behavior and in preventing escapes, was sufficient to justify the deprivations imposed. A number of experts testified, however, that isolation for longer than a few hours serves no legitimate therapeutic or disciplinary purpose and is unnecessary to prevent harm unless a juvenile is severely emotionally disturbed. In addition, the experts testified, extended isolation can by psychologically damaging and, under the conditions of Mayaguez, may be physically harmful." 714 F.2d at 1181.

We thus concluded that, in the light of the record before us, the use of isolation at Mayaguez deserved closer scrutiny than it had thus far been given, and that the district court was best suited to conduct further inquiry.

"[W]e think a remand is necessary for the court to consider, based on the testimony already presented to it and its own examination of conditions at Mayaguez, whether and to what extent isolation as employed [at Mayaguez] is reasonably related to any legitimate government objectives. In doing so, the court should consider whether isolation should be limited to certain time periods and should require additional safeguards, such as close supervision by a qualified expert and periodic review of the continuing need for isolation. Finally, the court should consider whether minimal additional individual attention might reduce the need for isolation.... The district court may be aware of other possibilities that, with minimal additional attention might alleviate the need for extensive use of isolation." 714 F.2d at 1181–82.

We pointed out that, under *Youngberg,* the reasonableness of defendants' practice regarding isolation "should be assessed in light of the judgment of qualified professionals." *Id.* 714 F.2d at 1182; *Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462.

## II.

Two factors seemed to motivate the district court to find that isolation as used at Mayaguez meets constitutional requirements. First, the court pointed to the sub-

stantial changes that had taken place in the conditions of confinement at Mayaguez.

"[I]t now appears that juveniles held in the Special Treatment Unit are given a daily exercise/recreation period, are permitted more reading materials than previously, and receive educational and tutoring services. In addition, written Mayaguez policy now limits isolation to a maximum of 10 days for first offenses, and 20 days in instances of multiple or recurring disciplinary offenses." *Santana v. Collazo*, No. 75–1187, slip op. at 7 (D.P.R. Oct. 30, 1984).

New written rules for the use of isolation also provide that "isolation of a juvenile will be carried out only when it is clearly justifiable and only for that period of time absolutely necessary to accomplish the purpose for which it is being utilized." *Santana v. Collazo*, No. 75–1187, slip op. at 7.[3] Second, after summarizing the relevant testimony, which included testimony at its earlier hearing and new expert testimony from plaintiffs, but not from defendant, the court noted the different perspectives and schools of thought that exist in the behavioral sciences, and the resulting "erratic and often frustrating tentativeness of knowledge in these fields", presumably including knowledge regarding isolation of juveniles, *id.* at 5.

The district court seemed to conclude that with the marked improvement in the nature of the confinement in isolation, and the uncertainty and conflict that he felt existed among experts over the value of prolonged confinement, there was an insufficient basis for finding that isolation as practiced at Mayaguez violated constitutional standards. Moreover, weighing heavily in its balance was its conviction that "the judgment as to what means are necessary to accomplish the State's permissible goals in the juvenile detention context is one properly left to State discretion in the first instance."

"[I]f responsible institutional and Commonwealth officials have determined in good faith that isolation at Mayaguez must in some cases be imposed for 10 days—or even as much as 20 days—to accomplish such objectives as maintaining institutional order or discouraging future occurrences of prohibited behavior by the involved intern or by others, that determination should not ordinarily be questioned by federal or judicial authority." *Santana v. Collazo*, No. 75–1187, slip op. at 8–9.

Accordingly, the court accepted the manner in which isolation is used at Mayaguez without considering whether the Commonwealth could significantly avoid or reduce the need for the use of prolonged isolation by adopting other techniques. *See Santana*, 714 F.2d at 1182; *Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462.

### III.

As we recognized in our earlier opinion, relying on *Youngberg*, 457 U.S. 307, residents of a juvenile detention center have "a due process interest in freedom from unnecessary bodily restraint", and restrictions on their liberty must be "reasonably related to legitimate government interests in imposing those restrictions". 714 F.2d at 1179. While the changes in the conditions of isolation at Mayaguez, as represented by defendants, have reduced the restriction of the juveniles' liberty interests, this does not mean that the isolation practice there now fulfills constitutional requirements. Rather, a court must determine whether this improved system of isolation is sufficiently related to the Commonwealth's legitimate objectives.

A court making this determination must adhere to a scope of review that has three facets. The first is obvious, namely that what is being reviewed is not isolation in the abstract but the congeries of conditions

---

**3.** In fact, isolation as a means of protecting either the juvenile or third persons is limited to a maximum of 48 hours, after which the case is referred to the Treatment Committee of the institution. The use of isolation for periods of up to ten or twenty days is only for disciplinary purposes.

attending the precise kind of isolation imposed on juveniles in the case at bar.

The second facet of review is the substantive standard to be applied, in this case whether there is a reasonable relationship between the isolation practiced at Mayaguez and the Commonwealth's interests in ensuring the safety of staff, public, and inmates, and in deterring and rehabilitating those placed in isolation. We think it unlikely that, under *Youngberg*, "reasonableness" in this context means that corrections officials are bound to employ the "least restrictive" alternative. We think it even more unlikely that the ordinary "rational relationship" equal protection test could be considered to give enough consideration to the liberty interests of these juveniles. What seems to be indicated from the Court's discussion in *Youngberg* of the state's duty to provide training to involuntarily committed mentally retarded inmates [4] is that if the need for restraints, in this case the need for extended isolation, can be *significantly* reduced or eliminated by other equally effective but less confining methods requiring relatively minimal additional effort, it is unreasonable not to use them.

Finally, under *Youngberg*, the third aspect of review in a case such as this is the deference that must be paid to a "professional decisionmaker" as to what is a reasonable restraint. 457 U.S. at 322–23, 102 S.Ct. at 2461–62. Such a decisionmaker is "a person competent, whether by education, training or experience, to make the particular decision at issue." *Id.* at 323 n.

30, 102 S.Ct. at 2462 n. 30. A decision by such a person—or by another acting on the advice of such a person—is "presumptively valid." *Id.* at 323, 102 S.Ct. at 2462. Thus, the test is not simply what responsible Commonwealth officials have determined *"in good faith"* is necessary for legitimate institutional reasons, but rather whether the isolation practice at Mayaguez accords with the *considered judgment of a qualified professional* as to what is necessary to accomplish the institution's justifiable goals. *See id.*, at 322–24, 102 S.Ct. at 2461–62. It is not the court's task to choose from among several professionally acceptable choices, *id.* at 321, 102 S.Ct. at 2461, but only to determine whether defendants' system of isolation is supported by some professional judgment. A court need not accept a professional judgment, however, if it is "a substantial departure from accepted professional judgment, practice, or standards." 457 U.S. at 323, 102 S.Ct. at 2462.

■ The evidence available at the remand hearing did not, we regretfully conclude, enable the court to make findings and conclusions satisfying these criteria. On the one hand, plaintiffs' experts gave extensive and detailed testimony, based on their professional judgments drawn from relevant experience, about the utility and hazards of prolonged isolation and other means of achieving the Commonwealth's legitimate goals. To indicate the nature of this testimony, we summarize it briefly in the margin.[5] In addition to such testimony there was evidence that United States De-

---

**4.** "In this case, therefore, the State is under a duty to provide respondent with such training as an appropriate professional would consider reasonable to ensure his safety and to facilitate his ability to function free from bodily restraints. It may well be unreasonable not to provide training when training could *significantly reduce* the need for restraints or the likelihood of violence." 457 U.S. at 324, 102 S.Ct. at 3462. (Emphasis added.)

**5.** One psychologist, Vincent Carbone, testified on the basis of a three year study that long confinements of juveniles resulted only in aggressive behavior after release and that short periods of isolation in an environment enriched through imaginative yet inexpensive incentives and more positive communication from staff would be effective. His view was that there was no justification for isolating juveniles for more than forty-five minutes.

A director of a maximum security juvenile facility in New York, Warren Albrecht, testified that any isolation imposed on an out-of-control youth should be only long enough for the juvenile to calm down. Indeed, his facility does not resort at all to isolation. These experts' views were consistent with experts who had testified at the earlier trial, as we have noted, that "isolation for longer than a few hours serves no legitimate therapeutic or disciplinary purpose." 714 F.2d at 1181.

partment of Justice standards limit confinement of juveniles in any case to twenty-four hours, and that American Bar Association standards set a maximum of eight hours of isolation for safety reasons.[6] Finally, courts that have considered isolation for juveniles have with near unanimity limited such confinement to twenty-four hours, with only rare exceptions allowed.[7]

In support of defendants' use of prolonged isolation, however, we have almost nothing before us that we did not have three years ago, except a sworn statement describing recent improvements at Mayaguez. Defendants chose not to present witnesses at the remand hearing, relying instead on inferences drawn from cross-examination, and from testimony presented during trial in 1980–81. Although Dr. Luis Iturino, the part-time psychiatric consultant at Mayaguez, testified at trial that the practice at Mayaguez of using fifteen to twenty days of isolation for disciplinary purposes was appropriate, this testimony was insufficiently complete for the purpose of ascertaining whether, in the considered judgment of qualified professionals, isolation as used at Mayaguez is "reasonably related to legitimate government interests in imposing those restrictions", 714 F.2d at 1179.

Defendants' failure to offer testimony at the remand hearing is puzzling in light of the burden they face. Once plaintiffs present substantial evidence that ten or twenty days of isolation is not only ineffective for safety and disciplinary purposes but also may aggravate conditions in the facility and cause psychological damage, defendants must respond with evidence of professional support for their isolation practice. To show that prolonged isolation is reasonably related to justifiable institutional objectives, they must also show that whatever legitimate needs are served by extended isolation are unlikely to be achieved by resort to other less burdensome practices such as shorter periods of isolation and/or a system of incentives and deterrents based on the granting and deprivation of privileges.

Ordinarily, after giving defendants the opportunity to make a record in support of their practices, which they declined, and faced with overwhelming support for plaintiffs in the form of expert testimony, national standards, and judicial precedent, we would find defendants' system of prolonged isolation to be unconstitutional. We refrain from reaching a final judgment at this juncture, however, for two reasons. First, we hesitate to substitute our judgment for that of correction officials charged with maintaining institutional order and security. *See Santana v. Collazo*, 714 F.2d at 1181; *Youngberg*, 457 U.S. at 323, 102 S.Ct. at 2462. We are far from being experts in the fields of behavioral science and juvenile justice, and recognize that the traditional tools of our decision-making—legal precedent and factual comparisons—are of limited value when we confront this still relatively new breed of institutional litigation. We must instead rely heavily on the views of both independent experts and of those running the insti-

**6.** United States Department of Justice, Report of the National Advisory Committee for Juvenile Justice and Delinquency Prevention. *Standards for the Administration of Juvenile Justice,* Standard 4.52 (1980); Institute of Judicial Administration—American Bar Association, *Juvenile Justice Standards, Standards Relating to Corrections Administration,* Standard 7.11(H)(2), (3) (1980).

**7.** *See, e.g., Milonas v. Williams,* 691 F.2d 931, 935, 941 (10th Cir.1982) (isolation allowed only to contain boy who is physically violent); *Morgan v. Sproat,* 432 F.Supp. 1130, 1140 (S.D.Miss. 1977) (limited to 24 hours and only when immediate threat to safety); *Pena v. New York State Division for Youth,* 419 F.Supp. 203, 210 (S.D.N.

Y.1976) (limited to six hours except in "the most extreme circumstances"); *Gary W. v. State of Louisiana,* 437 F.Supp. 1209, 1229 (E.D.La.1976) (limited to twelve hours unless renewed by qualified professional); *State ex rel J.D.W. v. Harris,* 319 S.E.2d 815, 820–21 (W.Va.1984) (citing earlier opinion, *State ex rel. K.W. v. Werner,* 242 S.E.2d 907, 916 (W.Va.1978)) (only when necessary to enable juvenile to gain control of himself). *See also Benitez on Behalf of Catala v. Collazo,* 584 F.Supp. 267, 269 (D.P.R.1984) (parties agreed to reject isolation as form of punishment for Puerto Rico youngsters designated as undisciplined by the Minors Code of Puerto Rico, 34 L.P.R.A. § 2002(b)).

tutions; in fact, *Youngberg* tells us that decisions supported by appropriate professional judgment are presumptively valid. 457 U.S. at 323, 102 S.Ct. at 2462.

We are therefore uncomfortable with the prospect of restricting the use of isolation at Mayaguez without more information about how, when and why the institution resorts to its use. The constitutionality of isolation practice, after all, cannot be determined in the abstract. The particular conditions of isolation, for example, will affect what may be considered a reasonable duration under due process standards. There is a difference between "total" isolation in a blackened room without any social contact whatsoever, and a more limited isolation practice that permits physical exercise, provides tutoring services, and allows reading materials in the cell (something closer to what may exist at Mayaguez now). Moreover, in determining what is reasonable, we should also take into account whether any restrictions have been placed on the circumstances under which isolation can be imposed. For example, we have been told that the new rules at Mayaguez restrict isolation for disciplinary purposes to those "infractions whose gravity and nature justify it". It could be, therefore, that juveniles now are confined only rarely and only for the most egregious offenses, such as assault with a weapon.[8] Testimony from plaintiffs' experts suggested that extended isolation for the most serious offenders within a juvenile facility might be reasonable, particularly if no other options are available. For example, Warren Albrecht, director of a juvenile center in New York, testified that youngsters at his institution who repeatedly harmed others might be prosecuted as adults and placed in an adult jail. Although taking a similar step at Mayaguez under 34 L.P.R.A. § 2004 or § 2007(c) seems possible, the record suggests that the procedure in Puerto Rico is unusually time-consuming, and it thus might be appropriate to confine a youngster in isolation for up to ten or twenty days while the procedure is underway.

We also do not know whether the Commonwealth has considered or tried alternatives to isolation, such as separating juveniles according to their problems. *See Santana v. Collazo*, 714 F.2d at 1182. We do not know whether Mayaguez is different from other maximum security institutions in that its juveniles are particularly difficult to control, *id.* at 1181,[9] or particularly capable of enduring lengthy confinement without harmful effects and with positive results.[10] Because our task is not to pass judgment on the use of isolation *per se*, but only on isolation as used at Mayaguez, we need answers to these specific questions. Plaintiffs' testimony about isolation in general also is relevant to the inquiry, however, because it is their contention, supported by professional opinions, that isolation of juveniles for longer than a few hours, *under any conditions*, is not reasonably related to any institution's legitimate objectives. Defendants must present professional support for their contention that this widely held expert view is inapplicable to Mayaguez.

Our second reason for deferring judgment is that we suspect that a full record will confirm our present view that *some* change is necessary to bring the use of disciplinary isolation at Mayaguez within

---

**8.** Trial testimony revealed that juveniles were committed to the isolation unit for such varied offenses as escaping, being disrespectful, disobeying a guard, using obscene language, and stealing money from a staff member.

**9.** That Mayaguez is the maximum security facility for Puerto Rico juveniles is not a sufficient response, since the juvenile facilities discussed by plaintiffs' experts included maximum security institutions.

**10.** Plaintiffs' expert Carbone acknowledged that the juveniles he saw in isolation during his brief visit to Mayaguez seemed stronger, both mentally and physically, than most juveniles he had seen in other isolation units. He stated, however, that they were in the early stages of their confinement. We also realize there is a possibility that Mayaguez allows more social interaction during isolation than do other places, making the experience less harsh.

48

constitutional bounds.[11] And if our suspicions bear fruit, we think it should be up to the district court in the first instance to decide the nature of the change. We think its proximity to, and familiarity with, Mayaguez will allow the district court to tailor its response more closely to the institution's needs. It may decide, for example, to monitor the disciplinary problems at Mayaguez for a period of time before deciding whether to order a specific alternative to isolation or simply to bar confinement for more than twenty-four hours. It may discover that separation of juveniles according to their particular problems is impossible at Mayaguez, but that adding staff either to provide "minimal additional individual attention" to everyone, *Santana v. Collazo*, 714 F.2d at 1181–82, or to oversee the most difficult offenders is a feasible alternative to the significant restriction of liberty resulting from isolation.[12]

■ In sum, what we were unwilling to assume the last time this case came before us, we are still unwilling to assume, namely that the Commonwealth's presumed interests in protecting the juveniles from harm, discouraging offending behavior and preventing escapes justifies the deprivation of personal liberty imposed at Mayaguez. While we recognize that there has been substantial progress in conditions in the isolation unit, the fact remains that defendants have failed to meet their burden of showing a legitimate interest in confining juveniles in isolation for as long as twenty days. This is a particularly significant failure in light of the plaintiffs' expert testimony and the legal authority uniformly in favor of only the briefest commitments to isolation. On remand, we expect that the Commonwealth will exert itself to be of maximum help to the court, so that it may thoroughly explore defendants' professed need to use prolonged isolation, including the practicability of less restrictive alternatives.[13]

*Accordingly, the judgment of the district court is vacated, and the case remanded for further proceedings consistent with this opinion.*

**11.** At the very least, on the basis of the evidence in the record thus far, we would expect that defendants should be required to make a "periodic review of the continuing need for isolation", *Santana v. Collazo*, 714 F.2d at 1181. *See, e.g., Juvenile Justice Standards* § 7.11H(8).

Although the ten to twenty day confinement for disciplinary purposes is our primary concern, it may be that the 48-hour maximum duration for safety purposes is also excessive and, on remand, we would expect the district court to consider that issue as well.

**12.** Whatever approach it chooses, we would expect the district court to require that records be kept of the use of isolation to facilitate later review.

**13.** We also expect that the district court will consider evidence as to whether defendants have failed to comply with their own rules regarding the use of isolation. Although the district court rejected as unsubstantiated allegations to that effect, plaintiffs submitted to us two sworn affidavits from residents of Mayaguez, dated February 11, 1986. One juvenile stated that he had been in isolation for three months, and the other reported a confinement of two months. Both remained in isolation at the time the affidavits were written. Defendants, however, challenged the veracity of these affidavits at oral argument.