319 S.E.2d 815

STATE ex rel. J.D.W., a Juvenile

v.

J.D. HARRIS, Superintendent of the West Virginia Industrial Home for Youths.

STATE of West Virginia ex rel. K.R.

v.

Ronald GREGORY, Superintendent of the Industrial Home for Youth.

Nos. 16237, 16345.

Supreme Court of Appeals of West Virginia.

July 12, 1984.

**691**

William W. Pepper and Andrew Nason, Charleston, for petitioner in No. 16345.

John Ernest Shank, Asst. Atty. Gen., Charleston, for respondents in No. 16345.

George Castelle, Juvenile Advocates, Inc., Charleston, for relator in No. 16237.

Janet Frye Steele, Asst. Atty. Gen., Charleston, for respondent in No. 16237.

McHUGH, Chief Justice.

These actions, No. 16237 and No. 16345, present similar issues to this Court and they have been consolidated for the purpose of resolution. These actions are before this Court upon petitions for writs of habeas corpus by two residents of the West Virginia industrial home for youth (hereinafter "juvenile correctional facility"), located in Harrison County, West Virginia.[1] The relators, J.D.W. and K.R., allege that as victims of mistreatment at that facility they have been subjected to cruel and unusual punishment prohibited by the Eighth

---

1. The West Virginia Department of Corrections recently closed its facility for the incarceration of youthful male offenders. That facility was called the West Virginia Industrial School for Boys, more commonly known as "Pruntytown." *See State ex rel. K.W. v. Werner,* 161 W.Va. 192, 242 S.E.2d 907, 908 (1978). The care, training and reformation of male and female juvenile offenders has been consolidated into one facility. *W.Va.Code,* 28–3–1 [1981], provides:

The West Virginia industrial home for girls, heretofore established and located at Industrial, in Harrison county, shall be continued and hereafter known as the "West Virginia industrial home for youth." The industrial home shall be charged with the care, training and reformation of girls and boys committed to its custody. It shall be managed, directed and controlled as prescribed in article one, chapter twenty-five of this Code.

Amendment to the Constitution of the United States and Article III, Section 5 of the Constitution of West Virginia.[2] The respondents in these actions are the superintendents of the juvenile correctional facility when these actions were commenced. This Court has before it the petitions for relief, all matters of record and the briefs and oral argument of counsel.

## I

## J.D.W.

At the time the petition for relief was filed with this Court on March 9, 1984, the relator J.D.W. was a 17 year-old male in the custody of the juvenile correctional facility. In 1982, J.D.W. had been convicted as an adult in the Circuit Court of Kanawha County for aggravated robbery and was serving a sentence of ten years.

The facts that give rise to the present action are disputed by the parties. The relator alleges that shortly before midnight on February 11, 1984, he was asleep in a "security room" when a correctional officer at the facility entered the room and kicked him in the chest. The relator further alleges that after he rose to his feet the same correctional officer then struck him in the left eye opening a wound that later required 11 stitches and then kicked his feet out from under him knocking him to the floor.

The respondent admits that the correctional officer struck the relator and kicked his feet out from under him during the altercation. The respondent maintains, however, that the officer's conduct was not malicious and was done instinctively by the officer in self-defense after J.D.W. first struck the officer on the left side of the face. The respondent claims that J.D.W. had been placed in the "security room"

between 6:30 p.m. and 7:00 p.m. on the day in question for breaking two window panes with his hand. At midnight on that same day, he was being moved by force to a "maximum security room" when the altercation between J.D.W. and the correctional officer occurred.

The relator asserts that an investigation of the incident by his counsel uncovered evidence of a number of similar assaults upon other residents of the juvenile correctional facility. This information was reported to the West Virginia Department of Corrections which then conducted its own investigation. The Department of Corrections dismissed the correctional officer involved in the altercation with J.D.W. for use of excessive force. The Department of Corrections took further disciplinary action against two other correctional officers who were subsequently reinstated to their positions with back pay.

As a result of reporting the above-described incident and the investigations that followed, the relator contends that he was the subject of harassment by the other correctional officers at the facility. Such harassment was in the form of repeated searches of his person and possessions. The relator further alleges that the trauma of the incident has produced both physical and psychological problems, including fear of sleeping, nightmares and headaches.

The relator argues that the violent incident with the correctional officer and the fearful environment within which he was forced to live constitutes cruel and unusual punishment in violation of the provisions of the Eighth Amendment to the Constitution of the United States and Article III, Section 5 of the Constitution of West Virginia. He prays for release from the juvenile correctional facility into the custody of his parents.[3]

---

**2.** *U.S. Const.* amend. VIII, provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."

*W.Va. Const.* art. III, § 5, provides, in pertinent part: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."

**3.** Pending the outcome of this action, the relator further prayed for interim relief in the form of a transfer to another appropriate facility which this Court granted in an order entered March 13, 1984.

Furthermore, on April 13, 1984, the relator filed, with leave of this Court, a supplemental petition for writs of habeas corpus and mandamus in which he alleges institutional and pro-

### K.R.

The action involving K.R. originated in this Court as a *pro se* letter in which the relator alleged certain misconduct by the staff of the juvenile correctional facility. Counsel was subsequently appointed to represent the relator and an amended petition for a writ of habeas corpus was filed with this Court on June 7, 1984. The relator's letter and the amended petition for relief both allege that for a period extending from May 7, 1984 to May 21, 1984, the relator was unlawfully "locked down" in his room at the facility.

The facts surrounding the "lock down," although not disputed by the parties, are not fully developed. The relator in his *pro se* letter indicates that he was "locked down" for being "out of control," but he further asserts that he was only "out of control" for a few minutes and that the extended "lock down" was excessive punishment. His amended petition alleges that the room in which the relator was locked was small with no light or furniture except for a bare mattress. It is further alleged that as a result of the "lock down" the relator was unconstitutionally denied free access to educational classes, toilet facilities and association with other residents of the facility.[4] Finally, the amended petition for relief asserts that educational, recreational and counselling programs at the juvenile correctional facility are unconstitutionally deficient to meet the rehabilitative needs of the relator.

The respondent admits that the relator was locked in his room contrary to statutory standards; however, the respondent denies that the relator's "lock down" constituted cruel and unusual punishment. In oral argument before this Court, the respondent admitted that there are no records to indicate who ordered the "lock down" of the relator. The respondent further denies the allegations of unconstitutionally deficient educational, recreational and counselling programs at the facility.

The relator K.R. prays that he be released from the juvenile correctional facility into the custody of his family. In the alternative, the relator prays that he be transferred to another appropriate facility because of his fear of retaliation from the staff of the juvenile correctional facility and the negative effects of this incident upon his progress.

### II

■ The threshold question presented to this Court involves the issue of mootness. The respondents in both actions have moved this Court to dismiss their respective cases as being moot. In the case of J.D.W., the respondent observes that on April 19, 1984, he reached his 18th birthday and, pursuant to *W.Va.Code,* 49–5–16(b) [1982], was returned to the Circuit Court of Kanawha County for reconsideration and modification of sentence.[5] After a hearing, that Court modified J.D.W.'s sentence and

gram deficiencies at the juvenile correctional facility have caused the violent disruptions at that facility. Specifically, the relator alleges deficiencies in the following areas: staffing, recreation, education, and vocational rehabilitation. The respondent objects to these claims in the supplemental petition and has moved this Court to strike the allegations from the pleading. However, for reasons stated below, this issue need not be addressed by this Court.

4. The record also contains handwritten attestations by other residents of the juvenile correctional facility claiming that they have been the victims of similar "lock downs" for periods ranging from 14 to 33 days.

5. *W.Va.Code,* 49–5–16(b) [1982], provides as follows:

No child who has been convicted of an offense under the adult jurisdiction of the circuit court shall be held in custody in a penitentiary of this State: *Provided,* that such child may be transferred from a secure juvenile facility to a penitentiary after he shall attain the age of eighteen years if, in the judgment of the commissioner of the department of corrections and the court which committed such child, such transfer is appropriate: *Provided, however,* that any other provision of this Code to the contrary notwithstanding, prior to such transfer the child shall be returned to the sentencing court for the purpose of reconsideration and modification of the imposed sentence, which shall be based upon a review of all records and relevant information relating to the child's rehabilitation since his conviction under the adult jurisdiction of the court.

placed him on adult probation for five years. The respondent, therefore, contends that inasmuch as J.D.W. is no longer a resident of the juvenile correctional facility and, because of his age, cannot be legally returned to that facility,[6] the issue of whether his treatment constituted cruel and unusual punishment is moot. With respect to K.R., the respondent asserts that the action should be dismissed as moot because the relator is no longer "locked down" and because such practices have been terminated at the facility.

In syllabus point 1 of *State ex rel. Durkin v. Neely*, 166 W.Va. 553, 276 S.E.2d 311 (1981), this Court reiterated the general doctrine with regard to mootness. We held as follows: " 'Moot questions or abstract propositions, the decision of which would avail nothing in the determination of controverted rights of persons or of property are not properly cognizable by a court.' Syllabus Point 1, *State ex rel. Lilly v. Carter*, 63 W.Va. 684, 60 S.E. 873 (1908)." However, in syllabus point 1 of *State ex rel. M.C.H. v. Kinder*, 173 W.Va. 387, 317 S.E.2d 150 (1984), we recently set forth a well-established exception to the mootness doctrine in cases similar to the ones before us. We held:

A case is not rendered moot even though a party to the litigation has had a change in status such that he no longer has a legally cognizable interest in the litigation or the issues have lost their adversarial vitality, if such issues are capable of repetition and yet will evade review.

In *State ex rel. M.C.H. v. Kinder, supra,* this Court enunciated guidelines for the preadjudication detention of juveniles in a "secure detention facility" when such juveniles have committed acts that would be crimes if committed by adults. The issue of mootness arose in that case when the juveniles who brought the action were released from such a facility and into the custody of their mother before the action could mature before this Court. We noted

that this occurrence did not render the action moot inasmuch as "[t]he improper detention of juveniles is obviously a situation capable of repetition, given the hundreds of youngsters placed on an interim basis in secure facilities each year." *State ex rel. M.C.H. v. Kinder, supra,* 173 W.Va. at 390, 317 S.E.2d at 153 n. 6.

We noted that this exception to the mootness doctrine has been accepted by this Court in the context of class actions, *see Rissler v. Giardina*, 289 S.E.2d 180 (1982), however, it is also applicable to single party litigants under certain circumstances. Quoting *State v. Gleason*, 404 A.2d 573, 578 (Me.1979), we outlined the following considerations:

"First, the court will determine whether sufficient collateral consequences will result from determination of the questions presented so as to justify relief. (citations omitted). Second, while technically moot in the immediate context, questions of great public interest may nevertheless be addressed for the future guidance of the bar and of the public. (citations omitted).

Third, issues which may be repeatedly presented to the trial court, yet escape review at the appellate level because of their fleeting or determinate nature, may appropriately be decided." (citations omitted).

*State ex rel. M.C.H. v. Kinder, supra,* 173 W.Va. at 390, 317 S.E.2d at 153.

■ It is clear in the actions before us that although the relators are not currently subjects of the specific misconduct of which they complain, such misconduct is capable of repetition at the juvenile correctional facility and presents broad issues of great public interest. If this Court were to dismiss these actions as moot, the respondents would be free to reinstate the practices described above. *See State ex rel. K.W. v. Werner*, 161 W.Va. 192, 242 S.E.2d 907, 910 (1978); *see also Gray v. Sanders*, 372

6. *W.Va.Code,* 28–1–2 [1980], provides, in pertinent part: "Any male youth between the ages of ten and eighteen years may be committed to the custody of the commissioner of corrections by a circuit court of this State in the manner prescribed in article five, chapter forty-nine of this Code ...." For the age limitations upon the commitment of female youth, see *W.Va.Code,* 28–3–2 [1980].

U.S. 368, 376, 83 S.Ct. 801, 806, 9 L.Ed.2d 821, 827 (1963); *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303, 1309 (1953). Furthermore, both relators allege that there are broad institutional and program deficiencies that not only precipitated these actions but virtually guarantee the recurrence of physical violence at the facility. In view of the allegations of continuous and systematic deprivation of fundamental rights at the juvenile correctional facility, this Court is not deprived of jurisdiction to pass upon the constitutionality of conditions of incarceration at that institution. The respondents' motions to dismiss these actions upon the ground of mootness are therefore denied.

### III

■ This Court must now consider whether the alleged misconduct of the staff of the juvenile correctional facility toward the relators and the alleged institutional deficiencies at that facility constitute cruel and unusual punishment under the Eighth Amendment to the Constitution of the United States and Article III, Section 5 of the Constitution of West Virginia. In syllabus point 1 of *State ex rel K.W. v. Werner, supra,* we held:

"Habeas corpus lies to secure relief from conditions of imprisonment which constitute cruel and unusual punishment in violation of the provisions of Article III, Section 5, of the Constitution of West Virginia and of the Eighth Amendment to the Constitution of the United States." Syllabus point 1, *State ex rel. Pingley v.*

*Coiner,* 155 W.Va. 591, 186 S.E.2d 220 (1972).

■ This Court has had prior occasion to review the punitive practices employed by staff of such a juvenile facility. In *State ex rel. K.W. v. Werner, supra,* we were asked to determine whether incarceration of male juveniles at the now closed West Virginia Industrial School for Boys, *see supra* note 1, violated their rights to be free from cruel and unusual punishment. Specifically, the relators in that case challenged various punitive practices on the part of the staff which included solitary confinement, "floor time," "bench time" and the use of chemical irritants.[7]

Following the concepts set forth in *Morales v. Turman,* 383 F.Supp. 53 (E.D.Tex. 1974), *rev'd on other grounds,* 535 F.2d 864 (5th Cir.1976), *rev'd per curiam,* 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977), we found such practices to be unconstitutional and held in syllabus point 3 as follows:

Punitive practices such as "bench time," "floor time," solitary confinement, beating, slapping, kicking or otherwise physically abusing juveniles incarcerated at the State Industrial School for Boys at Pruntytown is cruel and unusual punishment forbidden by the state constitution, and every person subjected to any of them absent exigent circumstances, shall be entitled to redress. W.Va. Const. art. 3, § 5.

In addition to our holding in *State ex rel. K.W. v. Werner, supra,* the legislature has enacted a statute that establishes certain minimum rights for those persons in West Virginia's juvenile facilities. *W.Va.Code,*

---

7. In *State ex rel. K.W. v. Werner, supra,* 161 W.Va. at 196, 242 S.E.2d at 909–10, the unlawful disciplinary practices were described as follows:

1) Inmates thought guilty of serious disciplinary offenses, such as escape, were punished by confinement in small, windowless steel-walled cells ... furnished with a combination toilet, wash basin and drinking foundatin, a steel cot with flame-proof mattress, and a light. There is an aperture in the door about eight by eight inches through which food and other articles can be passed. The cells are about four feet wide, eight feet long

and eight feet high. Youths placed in them were allowed to wear only their undershorts.

2) "Floor time" was a punishment whereby the inmate apparently was required to stand stiffly in one position for several hours each day without talking.

3) "Bench time" was a punishment that required the inmate to sit in a specified location with arms crossed for several hours each day and for several days without talking or moving.

4) Mace, a chemical irritant, was freely used by staff upon inmates whose behavior did not suit staff requirements.

49–5–16a [1978], provides that the Commissioner of Corrections and the Commissioner of Human Services shall promulgate rules and regulations "outlining policies and procedures governing the operation of those correctional, detention and other facilities in their respective departments wherein juveniles may be housed." The policies and procedures shall include standards in basic areas such as "cleanliness, temperature and lighting; availability of medical and dental care; provision of food, furnishings, clothing and toilet articles; supervision; procedures for enforcing rules of conduct consistent with due process of law, and visitation privileges."

*W. Va. Code*, 49–5–16a [1978], further provides:

[A] child in custody or detention shall have, at a minimum, the following rights, and the policies prescribed shall ensure that:

(1) A child shall not be punished by physical force, deprivation of nutritious meals, deprivation of family visits or solitary confinement;

(2) A child shall have the opportunity to participate in physical exercise each day;

(3) Except for sleeping hours a child in a state facility shall not be locked alone in a room unless such child is out of control;

(4) A child shall be provided his own clothing or individualized clothing which is clean, supplied by the facility, and daily access to showers;

(5) A child shall have constant access to writing materials and may send mail without limitation, censorship or prior reading, and may receive mail without prior reading, except that mail may be opened in the child's presence, without being read, to inspect for contraband.

(6) A child may make and receive regular local phone calls without charge and long distance calls to his family without charge at least once a week, and receive visitors daily and on a regular basis;

(7) A child shall have immediate access to medical care as needed;

(8) A child in a juvenile detention facility or state institution shall be provided access to education including teaching, educational materials and books;

(9) A child shall have reasonable access to an attorney upon request; and

(10) A child shall be afforded a grievance procedure, including an appeal mechanism.

Based upon the standards set forth in *State ex rel. K.W. v. Werner, supra,* and *W. Va. Code*, 49–5–16a [1978], J.D.W.'s rights would have been violated if, in fact, his allegation of an unprovoked attack by the correctional officer is true. As discussed above, we held in syllabus point 3 of *State ex rel. K.W. v. Werner, supra,* that "[p]unitive practices such as ... beating, slapping, kicking or otherwise physically abusing juveniles ... is cruel and unusual punishment forbidden by the state constitution, and every person subjected to any of them absent exigent circumstances, shall be entitled to redress." Furthermore, *W. Va. Code*, 49–5–16a(1) [1978], clearly states that a "child shall not be punished by physical force ...."

In addition, with respect to K.R., the respondent has admitted to this Court that the relator was locked alone in his room for an extended period of time during which the relator was not "out of control." *W. Va. Code*, 49–5–16a(3) [1978], clearly states: "Except for sleeping hours a child in a state facility shall not be locked alone in a room unless such child is out of control ...." [8]

8. The identical standards set forth in subsections (1) through (10) of *W. Va. Code*, 49–5–16a [1978], were contained in *W. Va. Code*, 49–5–16 [1977]. *See* 1977 W.Va. Acts ch. 65. Although not yet in effect at the time *State ex rel. K.W. v. Werner, supra,* was decided by this Court, we stated in footnote 3 of that case that such statutory standards set "excellent minimum treatment regulations which we find to be entirely consistent with our conceptions of constitutionally mandated care of incarcerated young people ...." However, the issue remains as to whether "the failure to observe each individual standard would give rise to a constitutional violation." 161 W.Va. at 213–214, 242 S.E.2d at 918 (Miller, J., concurring).

On a broader scale, the accusations of the relators are sufficient to merit a factual development of whether the management of the juvenile correctional facility by the respondents and other responsible state agencies has resulted in legally impermissible conditions.[9] Obviously, if such conditions exist, immediate action must be taken to remedy the deficiencies. A review of the limited record reveals that there are serious problems at the juvenile correctional facility. However, the full extent of the deficiencies cannot be known without full investigation and complete development of the facts.

The records in both cases before us are insufficiently developed. In addition to accusations of specific misconduct on the part of the staff, both relators set forth allegations of broad institutional and program deficiencies in the areas of education, recreation, vocational rehabilitation, staffing and counselling. Under the circumstances of this case, however, we do not believe that, as an appellate court, extensive facts may be developed before us regarding the incarceration of the relators and other juveniles at the juvenile correctional facility. We will defer to a more appropriate forum for the initial establishment of standards for the proper operation of the juvenile correctional facility after such development of the facts regarding the current operation of that facility by the Commissioner of Corrections and other responsible state agencies. *See Cooper v. Gwinn,* 171 W.Va. 245, 298 S.E.2d 781, 795 (1981). *E.H. v. Matin,* 168 W.Va. 248, 284 S.E.2d 232, 237–38 (1981); *State ex rel. K.W. v. Werner, supra,* 161 W.Va. at 212, 242 S.E.2d at 917 (Miller, J., concurring).

Accordingly, these cases are hereby transferred to the Circuit Court of Kanawha County for further proceedings over which Circuit Judge Larry Starcher shall preside. Counsel shall be appointed to represent the residents of the juvenile correctional facility and such proceedings shall commence within 90 days of the date that this opinion is served upon the respondents.

■ It is ordered that such proceedings shall be for the purposes of developing the facts surrounding the alleged misconduct on the part of the staff of the juvenile correctional facility toward the individual relators and to determine whether such misconduct violated their constitutional and statutory rights. It is further ordered that the circuit court shall develop the facts with regard to the accusations of broad institutional deficiencies at that facility. It shall be the duty of the circuit court to insure that the operation of the juvenile correctional facility complies with all minimum constitutional, statutory and regulatory standards.[10]

Specifically, the standards to be implemented by the circuit court shall include, but not be limited to, our holdings in *State ex rel. K.W. v. Werner, supra,* the provisions of *W.Va.Code,* 49–5–16a [1978], and regulations promulgated by the West Virginia Department of Human Services pursuant to *W.Va.Code,* 49–2B–4 [1981]. Such regulations were filed with the West Virgi-

**9.** The following public officials and agencies are primarily responsible for the general care, custody, education and rehabilitation of the residents of the juvenile correctional facility: the Commissioner of the West Virginia Department of Corrections, *W.Va.Code,* 25–1–3 [1977], *W.Va.Code,* 25–4–3 [1975], *W.Va.Code,* 62–13–1 [1977], *W.Va.Code,* 62–13–4 [1977]; the Commissioner of the West Virginia Department of Human Services, *W.Va.Code,* 49–2–3 [1941], *W.Va.Code,* 49–2–16 [1980], *W.Va.Code,* 49–2B–1 [1981], *W.Va.Code,* 49–5B–1 to 49–5B–7 (the West Virginia Juvenile Offender Rehabilitation Act); the West Virginia Board of Education and the State Superintendent of Schools, *W.Va.Const.* art. XII, § 2, *W.Va.Code,* 18–2–5 [1983], *W.Va.Code,* 18–2–23 [1980], *W.Va.Code,* 18–3–3 [1931]; the Director of the Division of Vocational Rehabilitation of the West Virginia Board of Education, *W.Va.Code,* 18–10A–3 [1971], *W.Va.Code,* 18–10A–4 [1945]; and the Board of Education and the Superintendent of the County of Harrison, *W.Va.Code,* 18–4–10 [1967], *W.Va.Code,* 18–4–11 [1933], *W.Va.Code,* 18–5–13 [1983]. To insure that deficiencies at the juvenile correctional facility are remedied, these persons and agencies are hereby made additional respondents.

**10.** It is well settled in West Virginia that a juvenile adjudged delinquent and committed to the custody of the State has a constitutional and statutory right to rehabilitation and treatment. *See State ex rel. H.K. v. Taylor,* 169 W.Va. 639, 289 S.E.2d 673 (1982); *State ex rel. R.S. v. Trent,* 169 W.Va. 493, 289 S.E.2d 166 (1982); *State ex rel. Harris v. Calendine,* 160 W.Va. 172, 233 S.E.2d 318 (1977).

nia Secretary of State on April 30, 1982, and were refiled with that office on January 1, 1983. These regulations were promulgated to effectuate the provisions of chapter 49, article 2B of the West Virginia Code which article mandates the Commissioner of Human Services to establish standards for the licensing and approval of child caring facilities and child welfare agencies in West Virginia. The purposes of article 2B are as follows:

> (i) To protect the health, safety and well-being of children in substitute care by preventing improper and harmful care; (ii) to establish statewide rules for regulating programs as defined in this article; and (iii) to encourage and assist in the improvement of child care programs.

*W. Va. Code,* 49–2B–1 [1981]. Series III of these regulations set forth the standards for the operation of all residential child caring facilities, public and private, including requirements for the operation of specialized facilities such as "secure residential facilities." *See* §§ 8.1 to 8.35.

Finally, in the event the circuit court determines that such regulations do not meet minimum constitutional and statutory requirements, we note the existence of a set of minimum guidelines established by the American Correctional Association and the Commission on Accreditation for Corrections for the administration and operation of similar juvenile correctional facilities. *See* American Correctional Association, *Standards for Juvenile Training Schools* (2d ed. 1983). These standards are part of a four volume series of publications designed to improve juvenile corrections throughout the United States. The volume dealing with juvenile training schools represents a detailed and comprehensive compilation of standards calculated not only to promote the rehabilitation and education of juveniles who have been adjudged delinquent for committing acts that would be crimes if committed by adults but also to protect the public. *See also* Institute of Judicial Administration, American Bar Association, *Juvenile Justice Standards Relating to Corrections Administration* (1980).

Based upon all of the above, these cases are transferred to the jurisdiction of the Circuit Court of Kanawha County for further proceedings consistent with this opinion.

Transferred with directions.