412 S.E.2d 485

**In the Matter of L.D. EGNOR, Jr., Judge of the Sixth Judicial Circuit.**

**No. 19619.**

Supreme Court of Appeals of West Virginia.

Submitted Nov. 6, 1991.

Decided Dec. 11, 1991.

Charles R. Garten, Charleston, for Judicial Investigation Com'n of W.Va.

Frederick D. Fahrenz, Charles W. Peoples, Jr., Hunt & Wilson, Charleston, for Judge Egnor.

WORKMAN, Justice:

This judicial proceeding was initiated by the Judicial Investigation Commission (hereinafter referred to as "the Commission") against the Honorable L.D. Egnor, Jr., Judge of the Circuit Court of Cabell County. The Commission charged Judge Egnor with violation of Canon 1, Canon 2, and Canon 3A(1) and (4) of the Judicial Code of Ethics.[1] The West Virginia Judicial Hearing Board (hereinafter referred to

---

**1.** Canon 1 of the Judicial Code of Ethics provides as follows:

A Judge Should Uphold the
Integrity and Independence
of the Judiciary

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

Canon 2 of the Judicial Code of Ethics provides as follows:

A Judge Should Avoid Impropriety and
the Appearance of Impropriety
in All His Activities

A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. A judge should not allow his family, social, or other relationships to influence his judi-

as "the Hearing Board") recommends to this Court that the charges against Judge Egnor be dismissed. After an independent review of the record, we hereby adopt the recommendation of the Hearing Board and order that the charges against Judge Egnor be dismissed.

I.

The charges against Judge Egnor were precipitated by events involving a fall 1988 investigation of the Russell L. Daugherty Youth Center in Cabell County by the Cabell County Prosecutor's Office.[2] In October or November 1988, the Executive Director of the youth center, Larry Jarrell,[3] received a telephone call from Charles Hatcher, Assistant Prosecuting Attorney for Cabell County, and was advised that the employment of Harry L. Johnston, Program Director of the youth center, should be terminated. Although the Executive Director was not advised of the specific nature of any charges against Mr. Johnston, Mr. Hatcher did advise Mr. Jarrell of the possibility that sexual abuse allegations were involved. The Executive Director agreed to a thirty-day suspension of Mr. Johnston, with pay, which would allow the prosecuting attorney's office to complete its investigation and advise the Center of the charges against Mr. Johnston. The prosecuting attorney never recontacted the Executive Director or the Board of Supervisors, and Mr. Johnston was reinstated in December 1988.

On February 2, 1989, Judge Egnor received the interim findings, work product,

---

cial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness.

Canon 3A(1) and (4) of the Judicial Code of Ethics provides as follows:

A Judge Should Perform the Duties
of His Office Impartially
and Diligently

The judicial duties of a judge take precedence over all his other activities. His judicial duties include all the duties of his office prescribed by law. In the performance of these duties, the following standards apply:

A. Adjudicative Responsibilities.

(1) A judge should be faithful to the law and maintain professional competence in it. He should be unswayed by partisan interests, public clamor, or fear of criticism.

(4) A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding. A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him if he gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond.

2. The Russell L. Daugherty Center is a resident facility for status offenders in West Virginia. "Status offender" is defined in W.Va.Code § 49–5B–3 (1986) as "a juvenile who has been charged with delinquency or adjudicated a delinquent for conduct which would not be a crime if committed by an adult." Residents are all under the age of 18 years and are all youthful offenders by virtue of acts or omissions which constitute offenses due to the offender's age. According to the testimony of Executive Director Larry Jarrell, the Center held status offenders for roughly one year and most were confined at the center for charges such as truancy, running away from home, or incorrigibility. The Russell L. Daugherty Center is wholly governed by the County Commission, and the Commission has the authority, under Special Act 178 of the West Virginia Legislature, to supervise the Center and to supervise its Board of Directors.

3. Larry Jarrell, prior to his retirement in 1989, was the Executive Director of the Cabell County Youth Center and was responsible for the Daugherty Center, the juvenile detention facility at Ona, and a public recreational area. These centers are governed by a nonpartisan board of directors and supervisors composed of members of various civic organizations such as the Bar Association, Ministerial Association, Board of Education, etc. The composition of the Board was set forth in Special Act 178 of the West Virginia Legislature in 1959. As explained by Executive Director Jarrell, the various civic organizations would appoint members from their respective groups, such that the Medical Association might appoint a physician, the Bar Association might appoint an attorney, and a PTA group would appoint some member of the PTA. Elected officials might also serve on the Board of Directors by virtue of their elected offices. Approximately 15 to 16 individuals would be appointed, with an active board of 10 to 11 individuals. According to Special Act 178, the individual Board members may be removed for incompetency or neglect of duty in office.

and recommendations of the Cabell County grand jury regarding the Russell L. Daugherty Facility.[4] The grand jury's findings were contained in a report entitled "Findings and Work Product Recommendations." The grand jury found that Mr. Johnston and Mr. Jarrell "failed to inform the Board of Supervisors of significant problems which have in the past occurred at the Russell L. Daugherty Center in regard to abuse and neglect of the Center's residents." The grand jury also found that Mr. Johnston failed to develop and implement proper rules and regulations for the control of the Center, failed to adequately supervise the staff, and failed to adequately provide for the safety and welfare of the resident children after having been informed of allegations of sexual abuse. The grand jury also found that Mr. Johnston failed to report to the West Virginia Department of Human Services specific allegations of sexual abuse between an employee and a female resident. The grand jury recommended that the Circuit Court of Cabell County appoint a Special Master to closely supervise the Center for a period of one year. Mr. Johnston was indicted by the Cabell County grand jury on February 2, 1989, and charged with the misdemeanor offense of failure to report in a timely fashion an incident of alleged sexual abuse of juveniles by youth center personnel. Mr. Johnston, subsequent to the events which formed the basis for the charges against Judge Egnor, was acquitted.

Two staff members of the Russell L. Daugherty Center were indicted for child sexual abuse. The grand jury found that a male employee and a female employee had had sexual contact on various occasions with juveniles detained in the Center. Those two individuals resigned and were no longer employees of the Center at the time the indictments were returned. The grand jury also submitted findings of fact indicating that the Board of Supervisors was improperly constituted, in that only five members of the twelve had taken proper oaths of office. However, following the presentment of additional testimony before the

Hearing Board, it was determined that the members had properly taken oaths.

Judge Egnor contacted Executive Director Jarrell by telephone on February 2, 1989. Judge Egnor advised Mr. Jarrell that Mr. Johnston should be terminated immediately. Mr. Jarrell informed Judge Egnor that he did not have sufficient information upon which to base Mr. Johnston's termination and suggested that Judge Egnor speak to the President of the Board of Supervisors, Madge Kolendo. Judge Egnor then informed Mr. Jarrell that he would take care of the matter himself.

Judge Egnor also appeared before the Cabell County Commission on February 2, 1989, and requested that the Commission enter executive session to discuss the personnel matter. The Cabell County Commission owned the property upon which the Center was situated. Furthermore, Special Act 178 of the West Virginia Legislature gave the County Commission the authority to supervise the Center and the Board of Supervisors, appointed for three-year terms. After discussing the findings of the grand jury, the Cabell County Commission resealed the documents, returned them to Judge Egnor, and voted to ask the circuit court to appoint a Special Master to assume operation of the Russell L. Daugherty Center. No member of the Board of Supervisors of the Daugherty Center was contacted regarding the orders entered, and Mr. Johnston received neither prior notice nor a hearing regarding the order suspending him.

An order was entered by Judge Egnor on February 2, 1989, appointing Henry M. Kayes to serve as Special Master of the court. The Special Master was to regulate and establish the orderly and expeditious supervision of the operation of the Russell L. Daugherty Center for a period not to exceed sixty days for the purpose of taking the reapplication of its present employees and the applications of prospective new employees. Upon motion of the Special Master, Judge Egnor entered an order suspending the employment of Harry Johnston as director of the Russell L. Daugherty Cen-

---

4. The grand jury was convened on approximately September 15, 1988, and Judge Egnor was assigned as the supervising judge. The prose- cuting attorney was investigating the alleged sexual abuse of juveniles by youth center personnel.

ter due to the pending indictment against Mr. Johnston.

On April 11, 1989, Michael Kolendo, husband of the Madge Kolendo who served as President of the Board of Supervisors, filed a complaint against Judge Egnor with the Commission alleging violation of the Judicial Code of Ethics. On June 1, 1989, Harry Johnston filed a similar complaint. Due to the commonality of factual allegations, the matters were consolidated for disposition by the Commission.[5]

## II.

The Supreme Court of Appeals of West Virginia has the authority to "make an independent evaluation of the record and recommendations of the Judicial [Hearing] ... Board in disciplinary proceedings." Syl. Pt. 1, in part, *West Virginia Judicial Inquiry Comm'n v. Dostert*, 165 W.Va. 233, 271 S.E.2d 427 (1980); *see also* Syl. Pt. 1, *Matter of Crislip*, 182 W.Va. 637, 391 S.E.2d 84 (1990). In addition, we have consistently held that "[u]nder Rule III(C)(2) (1983 Supp.) of the West Virginia Rules of Procedure for the Handling of Complaints Against Justices, Judges[,] ... Magistrates, [and Family Law Masters], the allegations of a complaint in a judicial disciplinary proceeding 'must be proved by clear and convincing evidence.' " Syl. Pt. 4, *In re Pauley*, 173 W.Va. 228, 314 S.E.2d 391 (1983).

During the Hearing Board proceedings conducted on May 30, 1991, evidence was received indicating that the four Cabell County circuit judges had met on several occasions between September 1988 and February 1989 to discuss the Daugherty Center. Judge Alfred P. Ferguson of the Circuit Court of Cabell County testified that the judges had heard rumors regarding the investigation of sexual abuse and had heard that the incidents may not have been properly reported to the authorities. The judges had agreed that since Judge Egnor had been assigned to supervise the

grand jury, he would be in a position to monitor the proceedings and to take what action he deemed necessary. During one of the judges' meetings, it was agreed that under no circumstances should Harry Johnston be permitted to remain at the Daugherty Center exercising jurisdiction over the children if he were indicted.

Judge Egnor testified that he first examined the grand jury report on February 2, 1989, and was shocked by the report. Judge Egnor explained that he felt the matter should be brought to the attention of the County Commission since indictments had been returned against personnel employed by the Commission. The Commission moved for the release of the indictments and the grand jury report for its review. The findings of the grand jury were contained in the report, referenced above, entitled "Findings and Work Product Recommendations." Judge Egnor granted the motion to release the grand jury indictments and report.

The Hearing Board recommended to this Court that the charges against Judge Egnor be dismissed based upon the judge's valid and justifiable perception that the seriousness of the status of the juvenile center required his immediate and concrete action. The Hearing Board, by order dated July 26, 1991, found that Judge Egnor's concern for the health and safety of the youth outweighed the allegations set forth in the Commission's complaint. The Hearing Board consequently found a lack of clear and convincing evidence that Judge Egnor violated any Canon of Judicial Ethics. Furthermore, the Hearing Board found that in the interest of protecting the welfare of the youth, not only at the Russell L. Daugherty Center, but at any state facility, a circuit judge must have the ability to act quickly and decisively without fear of reprisal based upon alleged ethical violations.

Rather than finding Judge Egnor in violation of the Code of Judicial Ethics, we believe that his actions should be applaud-

---

5. On February 16, 1989, Harry Johnston and Madge Kolendo filed a petition for a writ of prohibition in this Court. The petition was styled State of West Virginia, ex rel. George A. Stolze, Harry Johnston and Madge Kolendo v. L.D. Egnor, Jr., Case No. 18972. On March 13,

1989, after oral arguments on March 7, 1989, we ordered the petition dismissed. The petition for writ of prohibition was based on virtually identical facts set forth in the complaint against Judge Egnor in the present case.

ed. He responded quickly and decisively to a situation which threatened to adversely affect children being detained by the juvenile justice system. Those charged with the care and custody of children detained under court order in such facilities are of great importance to the rehabilitative efforts attempted at such facilities. The relationship between the offender and his counselor or caregiver was explored by Galan M. Janeksela in "A Commentary on the Treatment of Juveniles," as follows:

> One of the most important factors in the rehabilitation of juvenile offenders is the relationship between the juvenile and the treatment counselor. This is important in all rehabilitative situations, but, it is especially important in the rehabilitation of juveniles because juveniles are in need of a person who they feel cares about them. The relationship between a juvenile and his counselor should be based on a level of trust, but, it is not a trust relationship unless the juvenile perceives it as such.

38 Juvenile & Family Court Journal 5–6 (1987).

In *State ex rel. R.S. v. Trent*, 169 W.Va. 493, 289 S.E.2d 166 (1982), we discussed the general expectations of those who provide care to juveniles in detention facilities. We stated the underlying principle that "since the State has defined its interest in taking custody of delinquent children as rehabilitation, due process requires that the nature of the child's custody bear a relation to that rehabilitative purpose." *Trent*, 169 W.Va. at 508, 289 S.E.2d at 175.

To accomplish the rehabilitative goal of the juvenile justice system, all officers and employees of the State charged with implementing the provisions of the juvenile law are required to act in the best interests of the child and the public in establishing an individualized program of treatment which is directed toward the needs of the child and likely to result in the development of the child into a productive member of society.

*Id.* 169 W.Va. at 509, 289 S.E.2d at 176. We also stated in *Trent* that "[t]hose into whose care the child is placed have a responsibility to monitor and evaluate the progress of the child." 169 W.Va. at 509, 289 S.E.2d at 177; *see also State ex rel. J.D.W. v. Harris*, 173 W.Va. 690, 319 S.E.2d 815 (1984) (regarding policies and procedures to be employed in juvenile detention facilities).

Judge Egnor recognized that courts have a special obligation to protect juveniles being detained by the juvenile justice system. Custodians of juveniles detained by court order must be held to a high standard of responsibility to protect those in their care, and the court by whose hand such juveniles are detained has an inherent right to assure their safety and well-being. To that end, the actions of Judge Egnor merit commendation, not sanction.[6]

Upon review of the record, we agree with the contentions of the Hearing Board and hereby adopt its recommendation of dismissal.

Complaint dismissed.

---

**6.** We are left to wonder why the Board of Supervisors was so lackadaisical in its lack of concern for the safety of the residents of the Daugherty Center that, even in the face of the indictment, it chose to support, without so much as an investigation, the continued presence at the center of one charged criminally with failure to report allegations of sexual abuse of a child in his care.